I call the next case of Aditya Issa, a minor, v. School District of Lancaster. Mr. Speck. Your Honor, may I please the court? My name is Thomas Speck and I am from Marshden-E-Warren-Coleman-Goggin, represent the School District of Lancaster, the appellant, and I'd like to reserve two minutes of rebuttal. Okay, that request will be granted and would urge you to keep your voice up into that microphone which you readjusted. Okay, can you hear me? Okay, thank you. Okay. Your Honor, this matter concerns an August 26, 2016 order of the District Court that granted in part plaintiff's motion for preliminary injunction, pending final resolution, an order that the School District enroll and permit school-aged plaintiffs to attend McCaskey High School, beginning on August 29, 2016. They had been, previous to that, assigned to the Phoenix Academy at the School District, which the School District, the school board, had determined that was the best place to educate these plaintiffs. Obviously, the plaintiffs disagreed and the court disagreed and ordered that the decision-making authority of the board be overturned and assigned these plaintiffs to the McCaskey School. Mr. Speck, you argued for the first time in your reply that we should look as an additional element of a prima facie case to the on account of language, but in your opening brief you had agreed that the proper test here was the one that was articulated in C.G. and the Fifth Circuit's decision in Castaneda. How is your argument in the reply brief, assuming it's not waived, how is that consistent with the position that you took in your opening as to the articulation of the test in those two cases? Well, the test, Your Honor, that's set forth in C.G. talks about that there being language barriers, failing to take appropriate action to overcome those barriers, and that there be a resulting impediment to students' equal participation. But the statute itself, the plain language of the statute, says that no state shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin. And even though C.G. doesn't specifically state that in its holding of the test, clearly the statute itself sets forth that as a requirement for an AOA violation. That's not so clear even in the Supreme Court's articulation in Horn v. Forrest, that talks about the statute as, quote, one that requires taking appropriate action to teach English to students who grew up speaking another language. When you have that expression from the Supreme Court, and statutory language that suggests an affirmative obligation to provide language services as a means to address vestiges of the dual system, why are we talking about an additional element to a prime official case? Where is there any support for that? Well, the KEB v. Downingtown case, albeit an unreported Eastern District case, talks about that. And also the MLK case v. Michigan Board of Education from 1978, 451F, SEP 1324, also talks about that. But I would state again that the statute itself, the plain language of the statute is clear, and that it says specifically that it must be the denial of an appropriate education, of the equal educational opportunity, must be on account of national origin. And there are numerous cases that we've cited in our brief that talk about that assigning students on the basis of what occurred in this case, was they were assigning them on the basis that these were older students, they were 17 to 21-year-old students that were undercredited, they were coming from foreign countries. And they, in order to graduate, the school district was assigning them to the Phoenix Academy. It was assigning them on the basis of their age and undercredited status, not on the basis of their national origin. There's no evidence whatsoever on this record that any discrimination occurred on the basis of national origin. Were you, if an English-speaking 19-year-old came in, would you automatically assign that student to the academy as well? The older students who are undercredited were being assigned to the Phoenix Academy to enable them to comply with federal law and to achieve their diploma and graduate by the time they were 21. What good does it do to a student, and I think this is sort of implicit in this whole case, is you're forcing these students to make an either-or decision. Either they age out of 21 with a diploma, or they age out of 21 and hopefully can speak English. Which is more important? Well, I think they're both important, Your Honor, but I think, you know, in today's day and age, if you don't have a diploma... But if you can't speak English... Well, I think that, I would disagree that they can't speak English when they're coming out of this... Well, one of them had to testify by translator, as I understand it. One of them did, yes, Your Honor. But there were others, including, I believe his... Forgive me if I'm stating the wrong name here. I think his... It was a young man who read an essay to the court that he had written at Phoenix and he performed math problems for the court below and graduated from Phoenix. And there have been 30 or more other students, refugee students, the record shows, who have graduated from Phoenix, and some who have even gone on to college after that. But what is the meaning of a graduation, of a degree, if it doesn't reflect the actual education quality to allow them to understand the subject matter, not only in the English as a Second Language coursework, but in content courses? Well, Your Honor, I think, you know, you're kind of putting the rabbit in the hat there, that they're not getting that education at Phoenix. And we would disagree that the record supports that. We would argue that the record shows that they are getting a good education at Phoenix. And, in fact, there are numerous witnesses from the school district, including the former principal of Phoenix, the ESL coordinator from the School District of Lancaster, who talk about the similarities between the programs. And it's not just that McCaskey is better than Phoenix. That's not the test. The test is, were they getting a reasonable retention of education here? But the district court didn't find that that was the case, did it? No, it didn't, Your Honor. You have a heavy burden. I do have a heavy burden, Your Honor. You have to show that the district court's factual findings were clearly erroneous. I do, Your Honor. And we feel like we can make that showing based on the fact that the witnesses who testified for Phoenix, including the teachers, the directors, the principals, the people who had the day-to-day interaction with the course material, with the students who were in the schools, they testified. Yeah, but don't they, by necessity, have some bias to their own program? I mean, I'm not saying that the wrong way, but, I mean, you bring somebody in who's at Phoenix and you ask them, you know, does your school do A, B, C, and D? How likely is it they're going to say you do a lousy job? Well, Your Honor, I respect the integrity of teachers, the integrity of educators. I think they want to give students the best education possible. I don't think they're going to just, you know. And I guess that leads me to this question. For the students who would be pre-17, who would come in, who would be new to your district, pre-17, let's say somebody comes in at 16 years of age and they're under credit, you would give them their school of choice. You would give them the opportunity to go to Phoenix or to go to the International School at McCaskill, correct? Yes, Your Honor, and in fact, there's... What's so magical about 17 and over? Well, Your Honor, again, it's trying to get these students to obtain a diploma and to graduate from high school. And if they're at a certain age where they have a certain, you know, not enough credits... They're 18, they have four years, four school years, and they have a sixth grade, the equivalent of a sixth grade education. So they need to earn six years of education in four. Yes. Is that what you're saying? Yes.  The school district board looked at that... I guess my question is, what does it matter to the school district of Lancaster, who set up, you know, some good programs, obviously a good program at McCaskill and brought Phoenix in to do what they do. What difference does it make to you whether or not they would say, we would rather go to the international program because it's slower, we're going to get an English, we're going to learn an English language, we're going to be able to understand what we're learning, and we hopefully get a degree at the same time? What differences? Your Honor, the school board made the decision based on the fact that these students are widely differing ages and maturity levels from the 13-year-old, 14-year-old coming in from middle school to the possibly 20, 21-year-old getting their degree in an accelerated situation at Phoenix. The younger students are at McCaskill. The older students are at Phoenix. The board looked at that as a situation where sometimes the older students will get discouraged being in a classroom with the younger students in that, you know, why am I in this classroom with all these young kids? You know, it's discouraging. And there was testimony on that fact from the educators. They could at that point say, I don't want to be in with all these young kids, I want to go to Phoenix. They could say that, Your Honor, but a lot of times they drop out. These plaintiffs are saying that we think we should have the opportunity to go to McCaskill. They are saying that, Your Honor, but, again, school districts have to be run the way school boards and government bodies. I'm not unsympathetic to you being in front of us and saying that the federal courts shouldn't be running the Lancaster school district. I'm not unsympathetic to that argument, but I'm just not sure that I understand why it is that you've made this distinction. Well, Your Honor, as I stated before, again, the board made that assignment based on maturity levels, based on the fact that, you know, they didn't want 20, 21-year-old students with 13-year-old students. Wasn't that debunked in the record of the district court? That is, there was testimony from one of the school administrators that there are middle school students that are also at Phoenix, and there's a possibility of high school seniors, 21-year-olds, being in the same class as entering freshmen. That's true at Phoenix. Why would that be a reason to mandate that this group of students go to Phoenix for an accelerated program rather than go to the program of choice that provides them a slower introduction and arguably a more solid foundation of English language? Forgive me if I'm wrong, but I don't recall that part of the record where they said that middle school students were being educated with 21-year-old students. I'm not saying that you're incorrect, but even if there are some scattered students of that nature, they had their valid basis for the reasons that they did this, like I said, including the age and maturity level of these students. Where is the testimony of Dr. Mitsnick? Dr. Mitsnick. What page is that, Your Honor? In any event, counsel, going back to Judge Fischer's question about the burden here in the record, what do we do with the fact that we have from the plaintiffs in the district court expert testimony that the idea of combining structured immersion and an accelerated program is totally inappropriate and there's absolutely no research that supports it and corroboration of the fact that there's no supporting research by the school administration? Well, Your Honor, the expert that was offered by the plaintiffs never observed the classroom, never reviewed a lesson plan, never spoke to the teachers or administrators at the school district. And without seeing what was going on, we believe that her opinion was inherently implausible. As in similar cases that we cite in our briefs, such as the Teresa P. case and Flora's, experts based their testimony on firsthand information. This expert didn't, didn't observe anything, didn't have any experience, never even taught an ESL class in her life to students. But be that as it may, the administrators of the district, the teachers of the district whom the court looked at as, he referenced that they seemed like experts to him. I believe that was in the testimony. They all testified that this was a valid educational theory, English as a second language with structured immersion. And there are cases that we've cited in our brief that talk about the fact that certain states had even adopted this as a theory of education. But they all agree structured immersion, even the Supreme Court has spoken approvingly about the theory of structured immersion. But none of the administrators, and you haven't pointed us to anything that contradicts the district court's finding, that the combination of structured immersion with an accelerated program, that's what doesn't seem to have any support as a sound educational theory in combination. Is there something in the record that you can point us to that that combination has been deemed a sound educational theory? Well, there's testimony, and there's testimony of the instruction that was going on in Phoenix. And I don't have the exact records, but I know I cite them in the brief, and especially there's a list of facts that I cite in a reply brief where they talk about that this was a valid educational, sound educational theory being pursued at Phoenix. And the question isn't whether Phoenix was worse than McCaskey or if McCaskey was better than Phoenix, it's whether or not they were having a reasonable basis for education here. And, Your Honor, the... I think one of the problems that we face in these kind of cases is, this is here on a preliminary injunction, and you have to not only show that the factual findings are quite erroneous, but that the district court abuses discretion in granting the injunction. It seems to me a lot of the issues that you're talking about are more appropriately raised at the final injunction. You know, at the final hearing, when you can get an expert maybe, or you can develop the record more fully. When you do things in such a compressed time frame, you're going to be able to... Nobody can put together the kind of record they want to put together. That, to me, is the problem here, is we've got to say the district court abused its discretion and clearly was wrong in its decision. And a lot of the issues you're raising, I think, are better left until you have a hearing and you can really flesh out this record more fully. Well, I appreciate your position on it. I seem like I'm out of time here, but based on the briefs we filed, we feel like we've shown that the entire evidence, the entire record, shows that clearly a mistake was made, which is the standard for clear error and for an abuse of discretion. And to your credit, I mean, although you were required, you were following an order, but you not only moved these students, but I think you moved a couple other students. That's right. Pending this appeal. I'm not completely familiar with what they're doing below, but I know that these students had them moved. I think there were a couple others who were also moved. Not all, but some others. Right. Do you agree, as we're considering the issue of the prejudice, the harm that would be caused, that at this point, given that there was that, that the students are now at McClaskey and have spent many months there, that even if we were inclined to reverse, that we need to take account of additional harms that would be causing uprooting the students again and moving them back. I do think that that would possibly be a disruption. I'm not even sure what the district would do at this point down below, but what we're objecting to more than anything is that we're required to do these things from the beginning in contravention of what the board feels is in the best interest of the school district and the students.  All right, Mr. Speck, we'll have you back on the line. Thank you. Mr. Walter. Good afternoon. May it please the court, if you tell Walter for the American Civil Liberties Union on behalf of all plaintiffs in this case. How's that? Good. Thank you. I want to start where Judge Roy was going just a few minutes ago and say that the arguments that the court is hearing from the school district today are very much the arguments that the school district made in the district court. And when you're looking at whether or not certain kids were learning or whether they're using this kind of program or that kind of program or this is better or that's better, these are all factual findings that were made by the district court. And as your Honor has noted aptly, we are on a clear error standard here. And I want to quote a case that Judge Hardiman issued recently involving Lehman Brothers Holding versus Gateway Funding, and I read this and it seemed absolutely on point. On appeal, Gateway rehashes the argument it made to the district court, essentially asking us to weigh the evidence anew and make factual findings. We will not do so because clear error is reserved for findings completely devoid of minimum evidentiary support displaying some hue of credibility. That's a really high standard. And this court is not here to relitigate the facts that Judge Smith found. And unlike many preliminary injunctions which may come to this court on an emergency appeal on a truncated record, we had vibrant discovery, we had five long days of trial with 15 witnesses and an expert witness. You've got 2,000 pages of record here to support what Judge Smith found. We're also not here to second guess school districts' budgetary or educational policy decisions. And the Supreme Court in Horn instructs us to be weary of doing that. Where we have here in the record some basis that's been put forward by the school district, including an interest in these students having a high school diploma to be able to succeed and having some benefits that are different than what they would otherwise have at McCleskey, like smaller classes, a better teacher-student ratio. So why wasn't it an abuse of discretion for the district court not to defer to the district's decision that this was a sound educational approach for these students? Those are all arguments that the school district made below to Judge Smith who properly weighed all of those and made a determination that, in fact, Phoenix Academy does not satisfy the legal standard under the EEOA. A couple of points let me make here. Coming back to Horn, one of the things that Justice Alito says in Horn, it goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief. That's what we're talking about here. The only thing that Judge Smith did was apply the law under the EEOA to determine whether or not Phoenix was providing an appropriate education and under every measure he found that it was not. But the predicate for providing a remedy is, of course, that there's a violation. And we do need to review the question of whether the determination that he made as to the absence of a sound educational policy or perhaps the support for that or means of checking the success along the way, whether those were based on correct fact-finding and a proper application of the law of those facts. With all due respect, those are factual findings. Whether or not Phoenix is actually able to overcome language barriers of these students is a factual finding which is subject to clear error. And when you look at what it is that is in the record and what Judge Smith relied on, what you've got is literally students who, a student who came here, spoke little or no English, had little formal schooling, and actually graduated in 16 months having 47 days of absences and still couldn't speak English. He testified with a translator. Every single one of these students had to testify with a translator. You get four years of credits in 16 months. You had two students, Khadijah Issa and Kaseem Hassan, who actually testified that despite having been in that school for months, they could not tell the district court what the subject matter was in some of the classes that they were learning. But that testimony was contradicted by some of the witnesses from Phoenix, was it not? It was the students' own testimony. And when the court asked them, do you understand what you were learning in those classes, they said no. They didn't. I'm not sure how the school district could contradict what was going on. But it's not just the students. You also had two former teachers testify, including the teacher who had ran the ESL program for the last six years. They all said, you know, this speeding things up and teaching these students twice as fast as you normally would in a language that they don't understand just doesn't work. And, in fact, you have the ESL coordinator for the Lancaster School District also acknowledge that at this pace, it is difficult for students who don't speak the language who are beginning levels to be able to understand what's going on. Let me ask you a question on the statute itself. You know, your argument on the appropriate action, we've never spoken on what's appropriate action. The circuit. That is correct, Your Honor. And coming back to Judge Krause's initial question, first of all, we would say that argument is waived. It's not an argument that the district raised in their initial brief. It's not an argument they raised in their post-trial motion or proposed findings of fact in the district court. But if you're alleging a violation of the Equal Education Opportunity Act, so that's a part of your argument. Absolutely, Your Honor. And what I would say is if you look at just the plain language of the statute or the way it is set up, the Castaneda Court's interpretation of that makes absolute sense. The statute talks about no station. The Castaneda Court then gives us what would be referred to as a mode of analysis. And other courts, including the Supreme Court, have said Castaneda was well decided. But we still only have a mode of analysis. And I guess my discomfort here is sitting as a federal court trying to tell the Lancaster School District what to do under two words that to me are not very clearly defined in the law. Your Honor, as you point out, every appeals court and the U.S. Supreme Court has accepted that Castaneda As a mode of analysis. As a mode of analysis. But even if you tweak Castaneda, which is what Gomez v. Illinois, the Seventh Circuit, suggested, maybe down the road we're going to have to recalibrate it. You still have to determine whether or not the school district is providing a program that is sound and effective in overcoming students' language barriers and in this case, the evidence that Judge Smith found, and those are factual findings that are subject to an abusive discretion charge standard, is that in fact the school district is not overcoming those students' language. We have a very limited scope of review as we sit here. Your Honor, with all due respect, I think the court is bound by those factual findings. This court is not sitting here as a school board weighing the wisdom. It's truly only if there is absolutely no evidentiary standard to support Judge Smith's findings, and that clearly is not the case. What if we take McCloskey out of the picture? The district court spent a lot of the opinion in doing a comparison of the two. If we're looking at Phoenix in isolation, is it really your position that a school district that's offering an intensive program on both English language and core content classes that offers two 80-minute English language segments per day that has these push-in components available, at least through technology, that has that resource center available, an ESL teacher where students can walk in, sometimes one-on-one support in the classroom, that just looking at Phoenix in isolation, that you would still say that this was not appropriate in terms of addressing the language concerns? Absolutely not, and that is exactly what the district court did. The reason that Phoenix is examined at all is because the school district came back and said, McCloskey is the same as Phoenix and Phoenix is the same as McCloskey. So there's all this evidence about McCloskey. Whether McCloskey is good or bad, frankly, is immaterial to whether or not Phoenix satisfies federal law obligations under the EEOA and, in fact, it does not. Now, again, all of these suggested arguments that Your Honor has just raised about push-in and how much ESL they have, as a matter of fact, they have one ESL class, not two ESL classes, so McCloskey does have more. But regardless, these are all factual arguments that the school district presented to Judge Smith who weighed them all and determined that, in fact, based on what the students testified, what the teacher testified, teachers testified, the scores, the student scores, the expert testimony, this isn't even a battle of experts where on one side you've got an expert saying, oh, you know, what Phoenix is doing is kind of okay. You've got some self-interested school officials who are coming in and saying, yeah, this program is good, but if you read between the lines and you look at some of the citations in the record, they acknowledge that, in fact, this accelerated program is not appropriate for this level of students. That's not to say Phoenix isn't okay for some kids. If you need to get an education quickly and you speak English and that's not a barrier, that's fine. But we're talking about a very different population. We're talking about kids who came from very difficult backgrounds, speak little English. They don't understand what it means to learn in formal education the way we have. And you're speaking in a program where they know nothing about education or English and you're giving them information twice as fast. And as Judge Smith found, you know, intuitively that doesn't make sense. And what this record shows is that the expert affirmed that not only is that not appropriate, not only is she unaware of any expert out there that says this is appropriate, but in fact the testimony is that this is inappropriate and in fact retards the students because they get stressed out, they can't understand, they're more likely to back out. So those are all factual findings. Mr. Walczak, the Lancaster policy on students who go to Phoenix are the new to district students over the age of 17 and under credit. Is your suit only directed to that class of students in that category who also need English language training? It is, Your Honor. The proposed class, which Judge Smith has not yet certified, that's still pending, is English language learners. So we're not saying that if you speak English, you've messed around in school for whatever reason, you don't have enough credits, you want to get out of there quickly, that may be appropriate. But just as the Supreme Court in Laos said, a one-size-fits-all doesn't work when you've got kids who have some form of special disability. I mean, that's why we have the IDEA, that's why we have the EEOA for English language learners. So the same exact education that may work for some students is not going to work for others because they have a particular form of disability. And in this case, that is the fact that these students don't speak English. Now, how they fix that problem, there may be more than one way to do it. But what the district court determined in its discretion is that the school, in fact, has a program that they set up for the very purpose of helping this particular group of students. The school district knows what needs to be done. You slow things down, you give them more English, you shelter their instruction in the other classes. All those things are part of that program. The school district said, look, Phoenix is not working, there is an easy solution here because the district already has a school that is appropriate for this group of individuals. Isn't that an option that should have been left to the district? I mean, it's not an argument that's precisely raised, but in terms of the scope of the even preliminary injunctive relief that's granted here, isn't it rather unusual for a district court to direct to which school students should be enrolled? First, I would suggest that that determination by the judge is subject to an abusive discretion standard. And it is possible that down the road that the school district of Lancaster may come up with some other solution. This is one that enabled the school district to satisfy its obligations. It seems like the one that is the least intrusive. Because all they're really saying is you've got to educate these kids regardless. It's not working in this building. Take them down the street and educate them in this other building where you've already got a program that you school district have represented in official papers in the Pennsylvania Department of Education in 2015 that all students, like our clients, initially start out at the international school. So you may as well go ahead and do that. Can you address at least briefly, because your light is on, but I did want to hear your response to the argument that the state law claims are moot. And to the extent your complaint seems to be asking for some kind of supplemental education or compensatory education perhaps, or that you argue that another exception to mootness might apply, can you address that for us? Yes, Your Honor. First of all, as has become clear, I would hope, from the argument of the school district, they're not assuring this court, they certainly haven't assured us that if this court were to reverse and that injunction is lifted, that our clients are not going back to Phoenix. And they're the ones who pressed this emergency appeal. I would say there certainly is a danger that our clients could go back. So it's not moot for that reason. Let me ask you one final question here. What if the Lancaster School District did not have this international school at McCaskey? Would you have an argument here? Would that be the case? We would have an argument, and then I think the district would have to design some kind of program that helps these students actually overcome. So your challenge to what Phoenix is doing on behalf of the Lancaster School District could have significant ramifications in many other schools. Your Honor, this is... Moving forward. Your Honor, I don't... What's been interesting in sort of... This is my first flurry into the EEOA is we have a statute that's... And it's our first one, too. It is, and I think... I just wanted to say because the 5th, the 7th, and the 9th have all ruled on the EEOA. I think if you add the 3rd, so they have 3rd, 5th, 7th, 9th... But you don't have the 8th, do you? Your Honor, this is a statute that's been in effect for 40 years. There has been some litigation in places, or extensive litigation in places like Arizona and Texas. It has not completely overturned the way school districts operate, but it is a very important statute. We're talking about a very vulnerable group of students, and these are kids who did not win the lottery at life. They finally come here, and they have an earnest desire to simply learn English, get an education, give back to society, and their ticket to doing that is getting an education that helps them overcome their language barriers. And, you know, McCaskey is there. You know, on a different record, what the remedy would be, who knows? But they cannot stay at Phoenix where they are not learning. One last point, if I just may ask for the Court's indulgence. One very small last point. Very small last point. Consistent with how we treated the prior case. Then I think I have about a half hour. The question was what's going on in the school district, and I think it's important for this Court to understand what's going on below. The school district has taken a position in the proceedings below that similarly situated means students who are actually enrolled in the school district on the date of the injunction, on August 26. So all new students who have come into the district who are refugees, who are English language learners, are being sent to Phoenix. We have attempted to get Jed Smith to sort of either expand his injunction or provisionally certify a class, and he has made it quite clear that he is waiting on a decision from this Court. And so we would ask that the Court take that into consideration. We would very much welcome a prompt decision. I'm sure all the parties would, Jed Smith would, because there are similarly situated students who, at least in our argument, are being irreparably harmed by being housed at Phoenix where they're just not living. We understand your point. Thank you, Your Honor. Okay. Mr. Speck. Your Honor, real quickly, just on the enrollment issue that Judge Krause raised. The enrollment issue is new in that the Court found that the school district in the future is going to be complying with enrolling students within five days. That's all that state law violation pertained to is that they weren't enrolling them within the five-day period required by state law. How does that relate to there being a pending motion for class certification? The enrollment issue, Your Honor? Yes. I don't think the enrollment issue really does pertain to it. It's my understanding. Well, it does to mootness, doesn't it? Well, Your Honor, I'm not even sure the enrollment issue is part of their new they filed an emergency motion which I believe was denied on class certification. I don't think it's still pending. Again, I'm not 100 percent sure on that, but that's my understanding of what has happened in the lower court. Why wouldn't exceptions like capable of repetition yet evading review or the nature of the relief that they've sought, that is to the extent what they have asked for in the complaint involves something akin to compensatory education even beyond age 21 for time that they didn't receive English language abilities, wouldn't that avoid any mootness problem? Well, there hasn't been any argument that they were they're all enrolled right now, Your Honor. They're all receiving an education at this point, and I'm just going based on the language of what the court said is that the issue is moot as to them. That's what the district court said, and that we believe that the record shows that the district is going to comply with the enrollment requirements going forward. I just wanted to also touch upon the accelerated issue. There's a lot of confusion about accelerated means going quicker, going quicker, and the record clearly supports below that the accelerated is the 80-minute block scheduling that they're doing. They're receiving an 80-minute English as a second language instruction class, the communication arts, which is like grammar, that sort of thing, 80 minutes taught by an ESL-certified teacher. Those classes go slower. There's more attention paid to the students in those classes. What do we do with testimony from the teachers, the former teachers, that their understanding was they needed to cover twice the amount of material a year's worth within one semester? Well, I think you have to look at that in light of what the school board is trying to accomplish, again, is trying to get these kids to get diplomas, not drop out or not have a high school diploma by the time they graduate. I understand that goes to the goal, but to your point that this is not an accelerated program, isn't that the definition of accelerated? Accelerated is they're getting more credits. But in the actual learning that they're doing at the school, they're receiving 80-minute class instruction, which is beneficial. That's what the record is going to show when you look at it, Your Honor, below. There's numerous citations to that effect in our brief. And, you know, the other thing is that this is a program at Phoenix that's been evaluated every year by expert consultants. The record shows that. And that the PDE, the Pennsylvania Department of Education, is also reviewing this program, evaluating it year by year. But then we have here the district court coming in. We're trying to approve the program every year saying, no, no, no, it's not even reasonable for attention to providing an education. And we believe that's an abuse of discretion when we look at the entire record as a whole, Your Honor. Well, the school district has not disaggregated the data. Don't we have to rely on the one snapshot of disaggregated data we have from plaintiff's expert when we're reviewing the district court's decision here? And that seems to indicate that at Phoenix, the literacy of the students is significantly lower. But, again, that's going to the better, not better. If McCaskey didn't exist, would this suit have been brought? I don't know. No, it's going to the third prong under Castaneda. We need to look at the success of the program. And what do we have in this record as we're reviewing the district court's decision to say that there was either clear error or an abuse of discretion as to that prong of Castaneda? Well, you have to do just a QMH, I'm sorry, stating he understood 100% of what was going on in English class. Vonnie Long saying education at Phoenix was not bad. You have Sunan Song saying she liked the ESL class and felt that the teacher was very good at teaching. You have Anumu Dunia saying he understood his content classes, and he's the one who also read the essay in English and graduated, and that he writes and reads English better today than when he began at Phoenix. And you also have the 30 kids who have graduated before these with apparently no complaint at all. So, you know, again, they had the heavy burden below, which we believe that the district court disregarded because they were asking for mandatory relief. They weren't just asking for a preliminary injunction to stop doing something. They were asking for mandatory relief that these kids be put into another school, and that's a very heavy burden, an extraordinary remedy that they asked for, and that the court, we argue, based on the entire record, abused its discretion in providing, Your Honor. Okay. All right, Mr. Speck. Thank you. We thank you very much, and we thank the counsel on both sides for a job well done, and we'll take this case on.